IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SYLVESTER ANTHONY HARTIGAN,     )
                                          )
       Plaintiff,                 )
                                          )     No. 12 CV 5966
       v.                       )
                                          )     Hon. Charles R. Norgle
ILLINOIS DEPARTMENT OF         )
TRANSPORTATION,               )
                                          )
       Defendant.             )

## OPINION AND ORDER

CHARLES R. NORGLE, United States District Court Judge

Plaintiff Sylvester Anthony Hartigan ("Plaintiff") commenced this litigation against

Defendant Illinois Department of Transportation ("IDOT" or "Defendant"), alleging violations

of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq.* ("ADA") and

retaliation against Plaintiff for engaging in protected activity under the ADA. Before the Court is

Defendant's Motion for Summary Judgment. For the following reasons, that motion is granted.

## I. BACKGROUND[1]

The State of Illinois vests IDOT with "the responsibility for the planning, construction,

operation and maintenance of Illinois' extensive transportation network." Enabling Statutes, Ill.

Dep't of Transp., http://www.idot.illinois.gov/about-idot/our-story/governance/enabling-

statutes/index (last visited April 21, 2015). Specifically, Illinois charges Defendant with the duty

to repair and maintain the state's highway system. See 605 ILCS 5/4-201.6. Plaintiff began

working for Defendant at the Stevenson Main Yard ("Stevenson") as a highway maintainer some

---

[1] The following facts are taken from the parties' Local Rule 56.1 Statements. The Court takes all undisputed facts as true, and notes, where applicable, those facts that are disputed by the parties, construing them in the light most favorable to the non-moving party.

time in August 2007. In its job posting, Defendant illustrates various examples of work that it expects highway maintainers to do, including, *inter alia*, repairing and replacing road surfaces, culverts, and storm sewers; mowing and trimming fields around the highway; and operating and servicing trucks, tractors, mowers, snow plows, cinder spreaders, compressors, motor graders, loaders, backhoes, and other light highway equipment.[2] Ill. Dep't Cent. Mgmt. Servs. Class Specification – Highway Maintainer, http:www.state.il.us/cms/download/pdfs_specs/18639.pdf, at 1 (last visited Apr. 21, 2015). "[A]rduous physical labor" is required to fulfill Defendant's expectations. Id. at 2. Largely unseen in their thankless quest for safe, secure, and well-functioning roads, motorists typically see highway maintainers by dawn's early light, plowing and salting roads during brutal winters in Illinois generally and Chicago specifically. When not plowing roads, highway maintainers assist motorists, amidst the fumes, in the event of trouble. In short, Defendant's highway maintainers are commonly perceived as road warriors—tough, thick-skinned, and unflappable.

At two separate times, November 13, 2008 and November 4, 2009, Plaintiff visited his physician because he was experiencing difficulty breathing. Both times, his physician told him that his medical tests were normal, although at his 2009 visit, his physician told him that there was not an absence of Chronic Obstructive Pulmonary Disorder ("COPD") in Plaintiff.

On or about December 10, 2009, Plaintiff spoke with Yard Technician Jack Neven ("Neven"), Plaintiff's superior, about tobacco use among employees of IDOT as it related to him. Plaintiff told Neven that he was seeing a doctor for trouble breathing, and part of the problem was his exposure to cigarette smoke. Neven then called "everybody;" Plaintiff testified that Neven told the other IDOT workers at Stevenson, "[W]e have to quit smoking. You know,

---

[2] Although not discussed by either party, the Court takes judicial notice, pursuant to Federal Rule of Evidence 201, of the circumstances surrounding Plaintiff's usual working conditions.

Sylvester's got problems, and he can't deal with the smoke." Pl. Dep. 58:9–13, cited in Pl.'s Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶¶ 12–13 [hereinafter "PSF"].

Shortly after Neven's instruction to the other workers, Plaintiff began to experience instances of harassment at Stevenson that occurred between December 16, 2009 and September 17, 2010. On December 16, 2009, one of the acting leads (the term is used by Defendant but has not been clarified to the Court) at Stevenson, Joseph Hermann ("Hermann"), poked Plaintiff in the back, and later apologized to Plaintiff at a disciplinary meeting after Plaintiff complained (the "Touching Incident"). Plaintiff believes further (and Defendant denies) that the Touching Incident occurred as Hermann's retaliation for Plaintiff's earlier complaint of smoking by other employees. The next day (December 17), someone marked disparaging words "such as 'shithead' and 'rat'" on Plaintiff's car while it was parked in Stevenson's parking area (the "Car Words Incident"). PSF ¶ 16. Plaintiff believes that, similar to the Touching Incident, the Car Words Incident was motivated by his complaints of smoking. Plaintiff does not allege physical damage to his car. After Plaintiff complained to Neven, Neven replied that he would "take care of it on Monday [December 21, 2009]." Id. Plaintiff's car was not marked again.

Nearly one month later, on January 14, 2010, Plaintiff asserts that a dead rat was placed in his locker, although he never personally saw anything in his locker (the "Rat Incident"). The smell, supposedly from the rat, caused his locker and the adjoining locker to be removed and cleaned. Plaintiff admits that "[t]here was no rat in [his] locker when it was removed to be cleaned." Def's. R. 56.1 Stmt. Uncontested Facts Supp. Mot. Summ. J. ¶ 46 [hereinafter "DSF"].

On January 22, 2010, Robert Kohn ("Kohn" or "Mr. Kohn"), the acting lead assigned to Plaintiff, instructed other employees to watch Plaintiff while he performed maintenance in the field; one of the employees stated, "I'm not here to work. I'm here to watch you work." (the

3

"Observers Incident"). PSF ¶ 18. When Plaintiff, in Kohn's presence, brought the Observers Incident to Neven's attention, Kohn told Plaintiff, "[L]et's take this outside." Id.

One month after the Observers Incident, on February 22, 2010, Neven posted an announcement on a bulletin board that a Yard Technician position for the Eisenhower Yard had been filled (the "Bulletin Board Incident"). This was the first time that Plaintiff had seen Neven post an announcement for a filled position. Plaintiff previously told his coworkers that he had applied for, and hoped to receive the position. Plaintiff states in his Affidavit that at some later point, Kohn handed a tissue to Hermann "to give to [Plaintiff] so that [he] could dry [his] tears for not getting the technician position." Pl. Aff. ¶ 9(e), PSF Ex. 1, cited in PSF ¶ 19.

Three days later, on February 25, 2010, Plaintiff was advanced to the acting lead worker position, and became superordinate to Kohn, his former superior. According to Plaintiff, Kohn "went out and plowed the highway that Plaintiff had just finished plowing and plowed snow into the streets. Mr. Kohn then announced on the radio that the roads were never plowed so that Plaintiff looked like he had been negligent" (the "Snow Plow Incident"). PSF ¶ 20. Plaintiff claims (and Defendant disputes) that after he reported the Snow Plow Incident to Neven, Neven "did nothing." Pl. Aff. ¶ 9(f), cited in PSF ¶ 20. How the snow fell or continued to fall, and the need to plow again is not clear in the record.

The next day, on February 26, 2010, Plaintiff claims that "he had time sheets slapped from his hands by Mr. Kohn, who was his subordinate at the time, so forcefully that everyone in the room froze. Mr. Kohn then made a comment that Plaintiff's problems had just begun" (the "Time Sheet Slapping Incident"). PSF ¶ 21. Plaintiff reported the Time Sheet Slapping Incident to Neven, stating that "it was in retaliation for complaining of smoking in the workplace." Id.

4

Plaintiff again asserts that "nothing was ever done." Id. But Plaintiff has not alleged that it happened again.

> The day after that, on February 27, 2010, Plaintiff alleges that Kohn
>
> blocked all the parking spaces that Plaintiff normally parks in by parking his vehicle sideways. Once Plaintiff had found a more distant alternative parking space, Mr. Kohn reparked his vehicle the correct way so that there was room for other employees to park. Plaintiff brought this to Mr. Neven's attention and stated Mr. Kohn was doing this in retaliation for his complaining of smoking but to [*sic*] Mr. Neven responded that Kohn can park anyway [*sic*] he wants. [(the "Parking Incident")].

PSF ¶ 22. Two days later, on February 29, 2010, Plaintiff alleges that while he was having a conversation with a co-worker, Kohn inserted himself into the conversation and referred to Plaintiff by a series of derogatory names, including "pussy" (the "Name Calling Incident I"). PSF ¶ 23. As with the other Incidents, Plaintiff believes (and Defendant disputes) that "nothing was done" when he informed Neven about the Name Calling Incident I. Plaintiff subsequently filed a retaliation and hostile workplace complaint with the IDOT Bureau of Civil Rights ("IDOT-BCR") on March 22, 2010 (the "IDOT-BCR Complaint") against Neven and Lead Lead Ray Santoro ("Santoro"). While this was Plaintiff's first formal complaint to Defendant, Plaintiff chose to ignore Defendant's established complaint protocol regarding earlier events.

Five weeks after Name Calling Incident I, on April 6 and 7, 2010, Kohn—while he was talking to other people and in Plaintiff's presence—played an audio clip of a baby crying, stating that the clip was the ringtone employed when Plaintiff called Kohn on his cellular phone (the "Crybaby Ringtone Incident"). The record does not indicate whether Plaintiff reported the Crybaby Ringtone Incident to Neven, and does not indicate Kohn's motivation for his remark. Whether that ringtone sounded when the phone received calls from other persons is not clear in the record.

5

Approximately two weeks after the Crybaby Ringtone Incident, on April 19, 2010, Plaintiff was talking on his cellular phone when Kohn revved the engine of his motorcycle to the extent that Plaintiff was unable to continue his phone call (the "Revving Motorcycle Incident"). Plaintiff claims (and Defendant disputes) that when he brought the Revving Motorcycle Incident to Neven's attention, "Neven dismissingly rolled his eyes." PSF ¶ 25. How the call's delay harmed Plaintiff is not clear.

Two months after the Revving Motorcycle Incident, on June 10, 2010, Kohn insulted Plaintiff once again, calling him "mother fucker," "cock sucker," and "piece of shit"(the "Name Calling Incident II"). PSF ¶ 26. At some point in the conversation, Kohn also told Plaintiff "why don't you do everyone a favor and just commit suicide," which prompted Plaintiff to call the police. Id. The responding police officer told Plaintiff that "he could not do anything because there was no physical contact or threat of physical violence." Pl. Aff. ¶ 9(*l*), cited in PSF ¶ 26. The police officer spoke with Neven, who agreed to keep Plaintiff and Kohn away from each other.

On July 10, 2010, Plaintiff met with Neven for his annual performance review, at which Neven gave him a mediocre review (the "Performance Review Incident"). PSF ¶ 27. At some point during the review, Plaintiff noticed Hermann's performance review, which was "exceptional." Id.

Roughly three weeks later, on July 30, 2010, one of Stevenson's leads, Antonio Gale ("Gale") placed Plaintiff under Kohn's supervision for the day; Plaintiff claims (and Defendant disputes) that Kohn harassed him (Plaintiff does not specify how) "the entire day" (the "Harassment Incident"). PSF ¶ 28. Plaintiff then asked Gale to provide him with transportation to the clinic to let Plaintiff receive treatment for the stress and anxiety he experienced due to his

interaction with Kohn; Gale refused. After Plaintiff contacted Carmen Cortese in IDOT's

Personnel Department, he was provided with transportation to the clinic. At the clinic, Plaintiff

was diagnosed with anxiety. At or around the same time, Plaintiff also filed an Employee

Incident Report, where he claimed that his brain was injured due to stress arising from the

Harassment Incident. In light of his injury claim, Defendant required Plaintiff to pass a fitness-

for-duty test before it would let him return to work.

On August 3, 2010, Plaintiff met with members of IDOT-BCR to discuss the complaint

he filed on March 22, 2010. The IDOT-BCR members questioned Plaintiff regarding the veracity

of his complaint, and told him that he could be subject to discipline for making a false complaint.

Plaintiff alleges that as he was about to sign the applicable form, the computer malfunctioned,

and he was told to come back after a couple hours. Apparently, he did.

At some later time, Plaintiff (or his treating physician) requested light-duty work, which

IDOT denied on August 6, 2010. When Plaintiff later attempted to return to work, Neven

informed him that Plaintiff would be taking worker's compensation for his anxiety and sent

Plaintiff home.

While Plaintiff was off-duty, he sent a letter dated August 30, 2010, to Fulgenzi and Gary

Hannig, Illinois Secretary of Transportation ("Secretary Hannig"). Plaintiff states that the letter

was his request "to come back to work." Pl. Aff. ¶¶ 8, 12, cited in PSF ¶ 50. In his letter, Plaintiff

further explains:

> The Situation: In December I complained of smoke in the workplace. Since the
> complaint I have been harassed to the extent of seeking treatment for stress
> attributed to bullying by the Union Steward/Acting Lead Robert Kohn.
>
> Because based upon my certification and profession [sic] experience obtained
> with the Depart [sic] of Mental Health for the State of Illinois and my personal
> research and knowledge that Kohn had gotten into altercations resulting in the
> firing of one and transfers of at least two others, restraining orders filed in the
> courts and conduct admitted to by himself (Mr. Kohn) I find sharing a workplace

7

with him is not the best interest of the People of the State of Illinois or any or [*sic*] us.

As I look to completing my decompression therapy brought about by this situation. I think we all can agree going back to the Stevenson Yard with Kohn in it certainly is not a prudent and responsible choice. Make no mistake should it be the only option open to me I will go back. Instead I call upon both the Union and Personnel Department to explore some real possibilities for an alternative immersion back into the work place. It does not even have to be IDOT. I am educated more than most and have real job experience and leadership abilities.

PSF Ex. 3, at 21. On September 14, 2010, Defendant told Plaintiff that it was placing him on paid Administrative Leave that dated back to September 2, 2010, pending the outcome of his medical evaluation. On September 17, 2010, Defendant informed Plaintiff via letter that it was denying his worker's compensation claim and asked him to account for his absence from August 9, 2010 until September 2, 2010. Defendant's letter stated that Plaintiff would be able to use his accumulated 42.50 hours of sick leave and take a non-occupational medical leave of absence to account for the balance of his time. Plaintiff's accumulated sick leave is indicative of his positive work attendance.

Plaintiff filed his charge of discrimination (the "EEOC Charge") with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") on October 1, 2010. On October 21, 2010, Defendant sent Plaintiff notice that his March 22, 2010 complaint filed with the IDOT-BCR was denied because the facts developed by the investigation did not substantiate a civil rights violation. After completing his fitness for duty examination, as required by Departmental Guidelines, Defendant allowed Plaintiff to return to duty on November 8, 2010. On June 14, 2012, Plaintiff received his right to sue letter from the EEOC, and on July 30, 2012, Plaintiff filed his original complaint in this action.

On July 31, 2012, Plaintiff's pulmonologist, Phillip J. Cozzi, M.D. ("Dr. Cozzi") diagnosed Plaintiff with "mild COPD with multiple chemical sensitivity syndrome" after noting

8

the "vast[] improve[ment]" in Plaintiff's breathing caused by treatment involving a second bronchodilator. DSF Ex. H, at 12. Plaintiff continued to document his adverse experiences at Stevenson. Seven incidents occurred between June 18, 2012 and December 8, 2012. Each of these incidents involved some variation on a common theme: Plaintiff is assigned a vehicle that (he believes) had been smoked in by another employee at some earlier point in time; Plaintiff subjectively—by sniff—determines that the odor is smoke related; Plaintiff asks for a truck that does not smell like smoke; the target of Plaintiff's request becomes exasperated with Plaintiff's grievances yet endeavors to fulfil Plaintiff's request; and Plaintiff is ultimately dissatisfied with the attempted fulfilment, which causes him to file another formal complaint with his superiors.

Aside from the incidents that occurred from June through December 2012, Plaintiff also claims that he was denied Federal Emergency Management Agency ("FEMA") training by Defendant at some unspecified time while he was stationed at Stevenson. It is undisputed that FEMA training is not required for the discharge of Plaintiff's job duties and that, in any event, Plaintiff did receive FEMA training. Ultimately, Plaintiff requested a transfer from the Stevenson yard to Defendant's Hillside yard, which was granted sometime around Winter 2012. DSF ¶ 44; Pl. Dep. 20:4–11.

While the record does not indicate the point at which Plaintiff informed his superiors at Hillside about his sensitivity to tobacco smoke, the parties do not dispute that on or about March 5, 2013, Plaintiff gave a written letter from his physician, to Frank Vitagliano ("Vitagliano"), Hillside's Yard Technician. The letter stated, "Patient has been diagnosed with Chronic Obstructive Pulmonary Disease which is aggravated in a smoky environment. He should avoid areas where smoke has recently been in the air to avoid triggering a coughing and difficuly [*sic*] breathing reaction." DSF Ex. M, at 1. Plaintiff's physician did not note in his medical records

that Plaintiff complained of troubled breathing during his March 5, 2013 examination. Plaintiff did not submit a formal accommodation request, as required by Defendant's Affirmative Action Plan. See id. Ex. J, at 12, 32.

At Hillside, Plaintiff requested the same accommodations that he requested at Stevenson. Specifically, whenever Plaintiff was assigned to a truck that he believed smelled like tobacco smoke, he requested from his lead to be assigned to another truck that did not smell like smoke. With one exception, Plaintiff was assigned to a new truck whenever he complained that his assigned truck smelled like smoke. The availability of trucks is not developed.

On or about February 1, 2014, Plaintiff was assigned a vehicle in which one of his coworkers had smoked during the previous shift (the "Cigar Truck Incident"). Although Plaintiff requested a different truck that did not smell like tobacco smoke, Plaintiff's lead, Joseph Cozzi ("Cozzi") denied the request. Instead, "the truck was sprayed with a chemical and [Plaintiff] was forced to use that truck for the day." Pl. Aff. ¶ 17, cited in PSF ¶ 32. The record does not indicate what chemical was used, when it was used, the name of the employee that used the chemical, the name of the individual that "forced" Plaintiff to use the truck, or the means employed by that individual to force Plaintiff to use the truck. Plaintiff makes no claim that the truck could have been cleaned without the use of chemicals.

In any event, subsequent to the Cigar Truck Incident, Plaintiff "got sick" from the smoke and asked one of Hillside's leads, Johnny Jones ("Jones") if he could go to the hospital. When Jones asked Plaintiff how he became injured, Plaintiff responded that he became sick from people smoking in the truck. Plaintiff went to the hospital complaining of shortness of breath, red burning, itchy eyes, headache, nausea, and a cough. Plaintiff's treating physician at the hospital

instructed Plaintiff to continue using his bronchodilator and avoid tobacco smoke, and released him after the visit. Plaintiff returned to work the following morning.

Once Plaintiff returned to work, he learned that a petition was being circulated (the "Petition Incident"). Jones testified "they had a petition circulating. . . . it was for [Plaintiff]—against [Plaintiff]. They was [sic] trying to get him out of the yard." Jones Dep. 15:10–13, cited in PSF ¶ 33. While Jones testified that he saw the petition, he did not read it. The record does not indicate the individuals present when Jones or Plaintiff discovered the existence of the petition, the substance of the petition, the petition's signers, or how Plaintiff or Jones knew that the petition existed, or that it referred to Plaintiff. After Plaintiff discovered the petition, he informed Vitagliano, who told him, "I don't know anything about it." Id. No petition is in the record.

Separate from the Cigar Truck Incident, Plaintiff reported to Jones that one of Plaintiff's coworkers was smoking in his truck. Jones brought the smoking coworker to Vitagliano, who admonished him, saying "Don't smoke in the truck. You know not to smoke in the truck." PSF ¶ 35. The smoking coworker apologized for smoking in the truck. After this incident, Jones did not see another employee smoking in a truck, and Plaintiff never reported smoking in his presence. The parties do not dispute that "everybody there," smokers and non-smokers alike, "was complaining about [Plaintiff] complaining about [other workers] smoking." PSF ¶ 36.

On or about May 1, 2014, Plaintiff applied and was accepted for a promotion to lead worker; he was transferred to Defendant's Arlington Heights Yard where he remains presently. It is not clear when his promotion was posted. According to Plaintiff, he has not been subjected to any retaliatory actions at his current yard. At all relevant times in this case, Defendant provided Plaintiff with a non-smoking partner upon Plaintiff's request. In addition to non-smoking partners, upon Plaintiff's request, Defendant provided Plaintiff with IDOT vehicles that did not

smell like smoke or had been recently cleared to remove the smell of tobacco smoke. Further, in his promoted position, Plaintiff has not made any complaints pursuant to Defendant's protocol.

## II. DISCUSSION

### A. Standards of Decision

Summary judgment is proper if there is no genuine dispute as to any material fact, and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Cady v. Sheahan, 467 F.3d 1057, 1060–61 (7th Cir. 2006). A dispute is genuine and material if it would affect the outcome of the lawsuit—"if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted;" irrelevant factual disputes should not be considered. Id. at 249–50.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In his Complaint, Plaintiff alleges (1) Defendant failed to accommodate his disability, and (2) Defendant retaliated against Plaintiff by creating a hostile work environment in response to Plaintiff's inquiries regarding his disability.[3]

### B. Plaintiff's Failure-to-Accommodate Claim

---

[3] In his Response to Defendant's motion, Plaintiff argues additionally that he is a qualified individual with a disability under the "record of" prong of the ADA's disability test. See 42 U.S.C. § 12102(1)(B). But employer liability under the record-of prong is predicated on facts that demonstrate that the individual was discriminated against by his employer *because* of the records showing disability, not simply that the individual *possessed* records showing his disability. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 509 (7th Cir. 1998). Accordingly, the Court summarily rejects this argument.

In order to survive summary judgment for a failure-to-accommodate claim, Plaintiff must show sufficient facts to enable a reasonable jury to find that (1) Plaintiff was a qualified individual with a disability, (2) Defendant was aware of his disability, and (3) Defendant failed to accommodate Plaintiff's disability. See Kotwica v. Rose Packing Co., Inc., 637 F.3d 744, 747–48 (7th Cir. 2011) (quoting EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005)). The Court will discuss each element in turn.

*1. Plaintiff's status as a qualified individual with a disability.*

Before he can prove Defendant's violation of Title I of the ADA, Plaintiff must show that he is a qualified individual with a disability. 42 U.S.C. § 12112(a). An individual is "qualified" if he "can perform the essential functions of the employment position that such individual holds or desires," with or without reasonable accommodation. Id. § 12111(8). The parties do not dispute that Plaintiff is a qualified individual; rather, Defendant argues that Plaintiff is not "disabled" as defined by the ADA.

Under the ADA, an individual is disabled if, *inter alia*, he is burdened with "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). This requires the Court to ascertain the claimed impairment, identify the affected life activity, and determine whether the impairment substantially limits the affected life activity. See Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944, 950–51 (7th Cir. 2000). A disability determination must be made on an individualized, case-by-case basis. Homeyer v. Stanley Tulchin Assocs., Inc., 91 F.3d 959, 962 (7th Cir. 1996). As the parties do not dispute that Plaintiff's major life activity of breathing is the process claimed to be affected by his impairment, the Court is left to identify Plaintiff's claimed impairment, and determine whether his claimed impairment substantially limits his breathing.

13

###### a. *Plaintiff's impairments.*

For ADA purposes, a physical impairment is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). Here, Plaintiff claims that his allergic and/or chronic rhinitis and COPD are the physical impairments affecting his major life activity of breathing. See Am. Compl. ¶ 4. Defendant disagrees, arguing that under the actual disability prong of the ADA's disability test (42 U.S.C. § 12102(1)(A)), Plaintiff must support his claimed impairments with medical testing and diagnosis.

In this case, Plaintiff has provided no evidence to show that his breathing was affected by his rhinitis. Plaintiff's medical records show that his allergic and/or chronic rhinitis did not affect his breathing. There is no evidence in the record to suggest that Plaintiff's rhinitis impairment affected his respiratory systems. At both of Plaintiff's 2008 and 2009 visits, his physician was unable to determine the impairment that was causing Plaintiff to experience trouble breathing, and did not observe Plaintiff experiencing any shortness of breath. The only evidence shows that Plaintiff was not diagnosed with an impairment affecting his breathing until July 31, 2012, when he was diagnosed with COPD. Plaintiff had accumulated sick leave untaken. Accordingly, Plaintiff has not presented any evidence that would allow a reasonable jury to find that he experienced a disorder affecting his ability to breathe until he was diagnosed with COPD on or about July 31, 2012.

### b. *Whether the impairment is a substantial limitation on Plaintiff's major life activities.*

An impairment by itself is insufficient to render an individual disabled; Plaintiff's impairment must also substantially limit a major life activity, in this case, breathing. See 42 U.S.C. §§ 12102(1)(A), (2)(A); Turner v. The Saloon, Ltd., 595 F.3d 679, 689 (7th Cir. 2010). EEOC regulations specify further:

> An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population.* An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability."

29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added). Additional regulations instruct that the issue of whether an impairment substantially limits a major life activity "should not demand extensive analysis," and is not meant to be a demanding standard. Id. §§ 1630.2(j)(1)(i), (iii).

Adding further to the analysis, the substantial limitation on a major life activity does not have to be permanent to render the individual disabled. 42 U.S.C. § 12102(4)(D). An episodic or impairment in remission can still constitute a disability if its limitation on a major life activity impairs such an activity when active. Id. Ameliorative effects of mitigating measures (e.g. medication, medical supplies, prosthetics, or other appliances, technologies, or therapies) are irrelevant to the Court's determination of whether an individual is disabled. Id. § 12102(4)(E)(i).

Here, Plaintiff has conceded that his impairment substantially limits his breathing only when he is exposed to tobacco smoke. Plaintiff admits that "other than cigarette smoke making it hard for [him] to breathe, he has no other troubles performing his job duties," and that his job "usually gives him all the workout he needs as it is a 'physically demanding job.'" DSF ¶¶ 14, 16. Plaintiff also admits that he works out "sporadically" and would occasionally commute to work—three miles each way—using his bicycle. Id. ¶ 15.

15

The Surgeon General in 1972 reported that "[a]n atmosphere contaminated with tobacco smoke can contribute to the discomfort of many individuals." United States, Public Health Service, Office of the Surgeon General National Clearinghouse for Smoking and Health, The Health Consequences of Smoking 129 (1972), cited with approval in United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 695 (D.D.C. 2006). Plaintiff was not diagnosed with any respiratory disorders until July 31, 2012, when he was diagnosed with COPD. Although he was diagnosed with allergic and/or chronic rhinitis as far back as 2002, nothing in the record indicates that Plaintiff's claims of shortness of breath was due to his rhinitis. In sum, Plaintiff has not produced any evidence that his physical suffering from exposure to tobacco smoke from 2007 until July 31, 2012 was any greater than that experienced by any other non-smoking employee working with Plaintiff. Because Plaintiff's impairment of rhinitis did not substantially interfere with his major life activity of breathing, Plaintiff fails to show that he was disabled due to his rhinitis.

By July 2012, however, Plaintiff's symptoms had changed. After Plaintiff's difficulty breathing improved with the use of a bronchodilator that Dr. Cozzi had prescribed one month earlier, he determined that Plaintiff "likely has mild COPD with multiple chemical sensitivity syndrome." DSF Ex. H, at 11. In light of Plaintiff's COPD diagnosis, Dr. Cozzi recommended that Plaintiff continue to use the bronchodilator. On March 5, 2013, Dr. Van Reken wrote a letter stating "Patient has been diagnosed with Chronic Obstructive Pulmonary Disease which is aggravated in a smoky environment. He should avoid areas where smoke has recently been in the air to avoid triggering a coughing and difficuly [sic] breathing reaction." DSF Ex. M, at , 1. Thus, there is sufficient evidence to show that, as of July 31, 2012 when Plaintiff was diagnosed with COPD, he was limited in his breathing when in the presence of tobacco smoke more than

most people in the general population. Accordingly, Plaintiff has met his burden to show that, as of July 31, 2012, he was disabled due to COPD substantially interfering with his ability to breathe.

### 2. Defendant's awareness of Plaintiff's disability.

Next, Plaintiff must show that Defendant was *aware* of his disability some time after he became disabled on July 31, 2012. Before an employer can reasonably accommodate a qualified individual with a disability, that employer must be aware of the individual's disability. See Bultemeyer v. Ft. Wayne Cmty. Sch., 100 F.3d 1281, 1285 (7th Cir. 1996). This is the employee's positive duty: "[a]n employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations." Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996). While recognizing that it is the disabled individual's responsibility to inform the employer that an accommodation is needed, "[t]he employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." Bultemeyer, 100 F.3d at 1285.

After he became disabled on July 31, 2012, Plaintiff points to a letter from his physician, dated March 5, 2013 and addressed "To Whom it May Concern" to support his assertion that he provided Defendant with notice of his disability on or about that date. The letter requested an accommodation to "avoid areas where smoke has recently been in the air to avoid triggering a coughing and difficuly [sic] breathing reaction." DSF Ex. M, at 1. Accordingly, Defendant had notice of Plaintiff's disability on March 5, 2013.

### 3. Defendant's efforts to reasonably accommodate Plaintiff.

Next, Defendant argues that Plaintiff fails to show that it did not reasonably accommodate his disability. "Reasonable accommodations are '[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable [a qualified] individual with a disability . . . to perform the essential functions of that position[.]" Reeves ex rel. Reeves v. Jewel Food Stores, Inc., 759 F.3d 698, 701 (7th Cir. 2014) (quoting 29 C.F.R. § 1630.2(*o*)(1)(ii)) (alterations in original). An accommodation's reasonableness does not "depend solely on effectiveness or timeliness; in some circumstances, an accommodation can be reasonable even if it does not work as well as expected or if it takes a while to take effect." Hizer v. S. Bend Tribune, 31 F. Supp. 3d 986, 996 (N.D. Ind. 2014) (quoting Feliberty v. Kemper Corp., 98 F.3d 274, 280 (7th Cir. 1996)). Such an accommodation cannot be intangible, and must consist of some specific duty that the employer will assume. Beck, 75 F.3d at 1135.

The accommodation course consists of an interactive process. Sears, 417 F.3d at 805. While determining the appropriate accommodation is a collaborative process between employer and employee, the employer ultimately decides the accommodation, and is not required to accept the employee's requested accommodation. Hoppe v. Lewis Univ., 692 F.3d 833, 840 (7th Cir. 2012); see also Bultemeyer, 100 F.3d at 1285. Where the employee fails to provide sufficient information to permit the employer to ascertain the necessary accommodation, the employer is not liable for failing to accommodate the employee's disability. Reeves, 759 F.3d at 702.

In this case, Plaintiff requested to be paired with a non-smoking coworker and assigned trucks that were free of tobacco smoke or other residue when conducting field work. Plaintiff argues that Defendant "did not go far enough" to guarantee that its employees would not smoke in buildings or trucks. Plaintiff argues that Defendant's efforts to place Plaintiff in a smoke free

environment was "unreliable (and therefore unreasonable), which in Plaintiff's case, is no accommodation at all." Pl. Resp., at p. 13. Defendant argues that attempting in good-faith to provide Plaintiff (at his request) with smoke-free partners and trucks, was a reasonable accommodation sufficient to satisfy the accommodation provisions of the ADA.

Whenever Plaintiff complained to a superior that his assigned truck smelled of tobacco smoke, Plaintiff would be reassigned to a different truck that did not smell like tobacco smoke. Nevertheless, Plaintiff argues that Defendant failed to accommodate him with respect to the February 2014 Cigar Truck Incident. Plaintiff admits, however, that after his request for a new truck was denied, his assigned truck was cleaned. Plaintiff has not provided any evidence that cleaning the truck would have impaired Plaintiff's ability to breathe in the same manner as tobacco smoke and residue. The undisputed facts show that Defendant always accommodated Plaintiff's truck reassignment requests. Even when Defendant could not provide Plaintiff with an alternative truck, it caused his assigned truck to be cleaned.

Aside from his vehicle accommodations, the parties do not dispute that whenever Plaintiff was partnered with a smoker, or even someone who smelled like smoke, Defendant would reassign Plaintiff to a non-smoking partner. Separate from Defendant's endeavors to prevent Plaintiff's exposure to tobacco smoke and residue, Defendant disciplined those of its employees that it caught smoking. When Plaintiff found other employees smoking in the building or a truck, Jones, Plaintiff's superior, verbally reprimanded the employee, who then apologized. Defendant prohibited smoking, and disciplined those employees that it found violated the prohibition. Defendant took all reasonable steps to provide Plaintiff with clean, or recently-cleaned, vehicles, and partnered him with non-smoking coworkers. To what extent

Defendant must sniff and smell its employees for smoke-related odors is not presently before the Court.

Given the actions Defendant took after Plaintiff's requested accommodations, no reasonable jury could find that Defendant failed to reasonable accommodate Plaintiff. Thus, Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim.

## C. Plaintiff's Retaliation Claim.

Plaintiff's second claim alleges that Defendant retaliated against him for requesting a reasonable accommodation by creating a hostile work environment. The ADA prohibits an employer from discriminating against an employee because, *inter alia*, that employee opposed the employer's unlawful conduct or the employee filed an EEOC charge of discrimination. 42 U.S.C. § 12203(a). To survive summary judgment, Plaintiff must show sufficient evidence that would allow a jury to conclude that he (1) engaged in a statutorily-protected activity, (2) suffered an adverse employment action, and (3) his engagement in the protected activity caused the adverse employment action. Benuzzi v. Bd. of Educ. of City of Chi., 647 F.3d 652, 664 (7th Cir. 2011). There is no requirement that Plaintiff be disabled in order to state a claim of ADA-retaliation. Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 786 (3d Cir. 1998); Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001), cited with approval in, Freelain v. Vill. of Oak Park, No. 13 C 3682, 2014 WL 148739, *9 (N.D. Ill. Jan. 15, 2014) (noting the absence of controlling Seventh Circuit precedent regarding this issue).

*1. Plaintiff's engagement in a statutorily-protected activity.*

First, Plaintiff must show that he engaged in statutorily protected activity. "It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity." Durkin v. City of Chicago, 341 F.3d 606, 614–15 (7th Cir. 2003). Statutorily protected activity only occurs whenever an "individual has

20

opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. 42 U.S.C. § 12203(a). It follows therefore that the ADA is not a catchall statute creating a cause of action for any workplace retaliation, only retaliation occasioned by the plaintiff's involvement in protected activity.

Complaints of harassing conduct related to the employee's disability—whether formal or informal—can constitute protected activity under the ADA. Casna v. City of Loves Park, 574 F.3d 420, 427 (7th Cir. 2009) (holding that a statutorily-protected activity occurred when a hearing-impaired employee said, "Aren't you being discriminatory" in response to supervisor's statement, "How can you work if you cannot hear?"). In addition to filing complaints, requesting a reasonable accommodation in good faith is a statutorily-protected activity. See Hoppe, 692 F.3d at 842 (finding no dispute that requesting a reasonable accommodation is a protected activity.

Plaintiff argues that his complaints regarding the Touching Incident, the Car Words Incident, the Rat Incident, the Observers Incident, the Snow Plow Incident, the Time Sheet Slapping Incident, the Park-Block Incident, the Name Calling Incidents I and II, the Revving Motorcycle Incident, the Harassment Incident, and the Petition Incident (collectively the "Informal Complaints") are all examples of statutorily protected activity. But Plaintiff has not produced evidence that would demonstrate the actors' motives behind these incidents. Nonspecific bullying is not "an act or practice made unlawful" by the ADA. Unless Plaintiff shows that these incidents occurred because of his disability, Plaintiff is not protected by the statute for reporting the incidents to his superiors. There is no evidence in the record that would allow a reasonable jury to find that Plaintiff was complaining about harassment due to his

disability—whether for rhinitis or COPD. There is no evidence that would allow a jury to find that Plaintiff's coworkers knew that he was disabled. Thus, Plaintiff's Informal Complaints were not statutorily protected activity.

But Plaintiff did engage in statutorily-protected activities whenever he requested a reasonable accommodation for his disability. This includes his March 5, 2013 request for accommodation and every time he requested a tobacco-residue-free truck or a non-smoking employee. Similarly, Plaintiff has stated sufficient facts to allow a jury to find that he engaged in a protected activity every time he requested a tobacco-residue-free truck or a non-smoking employee because those requests were germane to his broader requests. In addition to the Informal Complaints and requests for accommodation, Plaintiff also argues that his formal IDOT-BCR and EEOC Complaints were statutorily protected activities, as were his ADA claims filed before this Court on July 30, 2012. As these activities are included on the face of the statute prohibiting retaliation, the Court agrees that these formal complaints are statutorily protected activities. See 42 U.S.C. 12203(a). Accordingly, the Court finds that Plaintiff's March 22, 2010 IDOT-BCR Complaint, his requests for partners and trucks free of tobacco smoke or residue, his October 1, 2010 EEOC Complaint, his July 30, 2012 litigation filed in this Court, and his March 5, 2013 request for accommodation are protected activities.

### 2. Plaintiff's adverse employment action.

Second, Plaintiff must show that he was the victim of some materially adverse employment action. Silk v. City of Chicago, 194 F.3d 788, 800 (7th Cir. 1999). "Materially adverse employment action" is defined broadly, and can include "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112; see also Silk, 194 F.3d at

800. Actions that are minor or trivial, even if adverse, are insufficient to state a discrimination claim under the ADA. Kersting v. Wal-Mart Stores, Inc., 250 F.3d 1109, 1115 (7th Cir. 2001) ("Otherwise, minor and even trivial employment actions that an . . . employee did not like would form the basis of a discrimination suit."). Plaintiff in this case argues that he was denied promotions and training, and was subjected to a hostile work environment in retaliation for his engagement in statutorily protected activities. Am. Compl. ¶¶ 15, 16. But Plaintiff fails to articulate specific employment actions or present evidence with respect to his failure to promote and failure to train arguments. Accordingly, the Court rejects these arguments and only addresses his allegations of a hostile work environment. Plaintiff does not dispute that he was promoted.

The Court notes initially that the Seventh Circuit has not determined whether the creation of a hostile work environment is a sufficient adverse employment action to support a retaliation claim under the ADA. See, e.g., Mannie v. Potter, 394 F.3d 977, 982 (7th Cir. 2005). Assuming one exists, "the standards . . . would mirror those . . . established for claims of hostile work environment under Title VII." Id.

A work environment becomes hostile when (1) the environment becomes "both objectively and subjectively offensive;" (2) the harassing conduct is based on the employee's disability; (3) the conduct is "either severe or pervasive; and (4) there is a basis for employer liability." Cf. Scruggs v. Garst Seed Co., 587 F.3d 832, 840 (7th Cir. 2009) (applying the above test to claims of sexual harassment brought pursuant to Title VII of the Civil Rights Act). These factors should be viewed in their totality. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

When determining the hostility level of a given work environment, the Court assesses "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an

employee's work performance." Scruggs, 587 F.3d at 841 (citing Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003)). Ultimately, the conduct must be so severe that the disabled employee's terms and conditions of employment themselves are changed. Ezell v. Potter, 400 F.3d 1041, 1047 (7th Cir. 2005). Mere offhand comments, simple teasing, and isolated incidents do not serve to alter the terms and conditions of employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).

Aside from the intensity of the hostility, the conduct must actually be discriminatory— the harassment must be based on the harassee's membership in a protected class, i.e. a qualified individual with a disability. See Dear v. Shinski, 578 F.3d 605, 611 (7th Cir. 2009); see also Shaver v. Indep. Stave Co., 350 F.3d 716, 721 (8th Cir. 2003) (finding that a work environment was not objectively hostile when an epileptic plaintiff who had a metal plate surgically affixed to his skull was nicknamed "platehead" by coworkers). Plaintiff's hostile work environment claim fails here because he has produced no evidence that would allow a reasonable jury to find that he was being harassed because he was disabled. All of the evidence that Plaintiff has marshaled shows that the incidents that have befallen Plaintiff arose from his complaints of coworkers smoking. Moreover, Plaintiff has not produced evidence that would show that his coworkers were even aware of his disability. A reasonable jury could not find that Plaintiff's coworkers were harassing him based upon his disability because there is no evidence that his coworkers knew that he was disabled. Accordingly, the Court finds that a reasonable jury would not be able to find that Plaintiff was subjected to a hostile work environment.

A jury could not find that his list of perceived slights and annoyances would show a change in the terms and conditions of his employment, necessary to prove a hostile work environment claim. Even when viewing the facts in the light most favorable to the Plaintiff, the

complained-of incidents as a whole were not physically threatening or humiliating, and they did not interfere with Plaintiff's work performance. Plaintiff was simply offended, which is not enough to survive summary judgment. Because Plaintiff fails to show that he was subjected to a hostile work environment, his retaliation claim fails. Therefore, Defendant is entitled to summary judgment on Plaintiff's retaliation claim

### III. CONCLUSION

For the foregoing reasons, the Court enters summary judgment for the Illinois Department of Transportation on Plaintiff's failure to accommodate and retaliation claims.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: April 22, 2015